**SPREADER SPECIALISTS, INC., Plaintiff,**

v.

**PUBLIC SERVICE COMMISSION OF UTAH, Brent H. Cameron, Chairman; James M. Byrne, Commissioner; Brian T. Stewart, Commissioner, Defendants.**

No. 21037.

Supreme Court of Utah.

June 23, 1987.

Scott M. Matheson, James M. Elegante, and Michael L. Larsen, Salt Lake City, for Spreader Specialists.

David L. Wilkinson and Bernard M. Tanner, Salt Lake City, for Public Service Comn.

Thomas M. Zarr and Rodney R. Parker, Salt Lake City, for W.S. Hatch & Co.

Robert L. Stevens, Salt Lake City, for Clark Tank Lines, Energy Exp., and Matlack, Inc.

HOWE, Justice:

Plaintiff Spreader Specialists, Inc., appeals the Public Service Commission's denial of its application for a certificate of authority to haul petroleum-based products.

Commencing with its inception in 1976, Spreader Specialists operated under the authority of another certificated carrier through leasing arrangements. In 1984, Spreader was granted interstate authority to haul petroleum-based products in fourteen western states; it also received intrastate authority in Idaho, where it was incorporated. Spreader made application for intrastate authority in Utah, but was opposed by the four carriers that held the existing authority to haul petroleum products: Matlack, Inc., Clark Tank Lines, W.S. Hatch Co. (Hatchco), and Energy Express.

At the hearing, fifteen shippers testified in support of Spreader's application. They testified as to the seasonal nature of the asphalt spreading business, the projected growth in the industry, the need for additional carriers, the problems they had experienced with the existing carriers, and the quality of service they had received from Spreader. The operating officers of the existing carriers testified as to the competitive market rates, financial difficulties they were experiencing, lack of projected growth, and adequacy of existing service to meet current and projected needs. After nine days of hearings, filling nearly 2,000 pages of written transcript, the Public Service Commission found the following: The applicant had experience and expertise and was operationally fit. The applicant was in compliance with the regulatory requirements and met the test of regulatory fitness. Although operating within a competitive rate . structure, the applicant would have a comfortable operating ratio and was therefore financially fit. The Commission also found that although there was some evidence of prospective growth, that alone did not justify granting the application; that Matlack, Clark, and Hatchco had spreader equipment adequate to the task; and finally, that granting the certificate was likely to exacerbate inefficient equipment use since no interlining or backhauls were available in the markets involved.

Based on these findings, the commission concluded: Despite some service problems, existing service was adequate. Granting the certificate would not contribute to the solution for meeting peak demand for a seasonal business, nor would there be beneficial impact on existing rates. The existing carriers' operations were only marginally profitable, and additional competition may cause them to cut corners on safety requirements and curtail their operations to save money. Granting the certificate was likened to the "straw capable of breaking the camel's back." The Commission stated: "Were the operations of the existing carriers financially sounder, or were we convinced that applicant's entry into the market would offer the shipping public real benefit, we would be inclined to grant the application. However, on this record, we conclude the application must be denied."

■ Spreader contends that the Commission improperly focused on the potential harm to existing carriers rather than on the potential benefits to the public in deciding whether the "public convenience and necessity" would be served by the granting of the certificate. In reviewing the Commission's interpretation of the operative provisions of the statutory law it is empowered to administer, we apply the intermediate standard of review discussed in *Utah Department of Administrative Services v. Public Service Commission*, 658 P.2d 601 (Utah 1983). Under this standard, we examine the Commission's decision to determine if it is reasonable, with reference to the specific terms of the underlying legislation and the public policies sought to be served.

The operative terms of the statute in question, Utah Code Ann. § 54–6–5, are "public convenience and necessity." In *Big K Corp. v. Public Service Commission*, 689 P.2d 1349 (Utah 1984), we reexamined those terms in light of the public policy supporting the regulation of the trucking industry. There, we construed "public convenience and necessity" to foster competition wherever feasible, recognizing that "competition is almost always an affirmative factor in furthering the public convenience and necessity." *Id.* at 1355. This language was cited with approval in *Milne Truck Lines v. Public Service Commission*, 720 P.2d 1373 (Utah 1986), where we reemphasized the benefits of increased competition and reiterated that the policy behind the regulation of motor carriers is one of fair, regulated competition, rather than governmentally protected monopoly. No more clear indication of that policy is given than in the recent revision of the Motor Carrier Act.[1] The introduction to the amended Act, Utah Code Ann. § 54–6–2, declares the intent of the legislature in

---

**1.** Utah Code Ann. tit. 54, ch. 6, §§ 1–50, 1986 Utah Laws ch. 208, § 1, *repealing* Utah Code Ann. §§ 54–6–1 through –25, effective Oct. 1, 1986.

regulating the trucking industry. It states:

It is declared by the Legislature:

(1) a safe, sound, *competitive,* and fuel efficient intrastate motor carrier system is vital to the economy of this state;

(2) it is in the public interest to regulate transportation by motor carriers as to fitness, safety, and insurance in order:

(a) *to promote* adequate, economical, *competitive,* efficient service by motor carrier, and reasonable charges, without unjust discriminations, *undue preferences, or advantages;*

(b) to enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions;

(c) *to promote competition;* and

(d) to foster and promote the trucking industry owned or based in the state; and

(3) adequate motor carrier service at affordable rates is a desirable policy for all cities and rural areas of this state.

(Emphasis added.) Although the statute was not in force at the time of the Commission's decision, it is consistent with the recent case law of the Court and mirrors the language of our decisions. Therefore, we cite the revised act as a legislative affirmation of the interpretation given "public convenience and necessity" in *Big K.*

■ In the instant case, it appears that the Commission denied the application primarily because of the potential diversion of income from existing carriers, despite the fact that we had stated in *Big K* that "the fact that additional competition will divert revenues from existing carriers is not a valid reason by itself to justify a denial of additional authority." 689 P.2d at 1355. In so doing, the Commission discounted the beneficial effects that competition will have on services. Increased competition need not impact existing rates to provide a real and tangible benefit to the shipping public. Service that is more responsive to the needs of shippers, that is more efficient and dependable, will attract loyal customers and will produce incentives for other shippers to increase the level and quality of their service in order to compete. This is why fair competition, rather than the preservation of existing monopolies, has been recognized to best serve the public "convenience and necessity."

There was no evidence that Spreader would compete unfairly, that it would "cream" the market by servicing only the most profitable routes, or that it would employ predatory practices or otherwise unfairly compete. The Commission's decision that the certificate must be denied for fear that allowing Spreader to operate under its own authority would "break the back" of existing carriers is "beyond the limits of reasonableness and rationality" and must be reversed. Granting the certificate will result in some diversion of revenue from protestants. However, of the certificated commodities as a whole, less than two percent of the market share each carrier now enjoys need be diverted in order for Spreader to meet its own optimistic growth projections. This figure is based on the projected revenue figures given by protestants, adopting their projection of zero market growth and assuming that Spreader will divert revenue only from the protestants rather than from the entire market fleet, which includes other contract carriers, proprietary fleets, contractors, and governmental bodies.

The policy behind the regulation of the trucking industry is to promote public convenience. While this includes allowing "efficient and well-managed carriers to earn adequate profits" by preventing predatory pricing, unfair trade practices, and restricting entry into the field where the market will not support an additional carrier, it does not mean that the Commission should protect existing carriers from the effects of fair competition by denying the application of a fit and able carrier.

It is decidedly not the law that established motor common carriers should be protected by the Commission from new competition as long as they provide a reasonably adequate service and can meet growing demands for common

carrier service.... [C]ertificates of authority do not confer the right to exclude competition simply to protect their own self-interest. On the contrary, it is the policy of the act to foster competition, unless the public convenience and necessity dictates otherwise....

*Milne Truck Lines v. Public Service Commission*, 720 P.2d at 1376 (citations omitted).

It should be clear from the decisions of this Court and the subsequent action of the legislature that the policy behind the Motor Carrier Act is one of regulated competition rather than protectionism. The existence of adequate service does not mean that service could not be improved by competition. *Id.* at 1377. The fact that competition may divert revenue from existing carriers, without a strong showing that the market will not support the additional competition, does not require denial of a certificate of authority on the ground of "public convenience and necessity."

The decision of the Commission denying the certificate is reversed.

STEWART, Associate C.J., and DURHAM, J., concur.

ZIMMERMAN, Justice (dissenting):

I agree with the majority that our decisions in *Big K Corp. v. Public Service Commission*, 689 P.2d 1349 (Utah 1984), and *Milne Truck Lines v. Public Service Commission*, 723 P.2d 1373 (Utah 1986), as well as the recent revisions of the Motor Carrier Act, Utah Code Ann. § 54–6–1 to –50 (1986), place heavy and appropriate emphasis on the benefits increased competition will bring to the public, and they require that there be sound grounds for denying an application for a certificate when its grant would enhance competition. However, having recited this policy and documented its origins, the majority does not then carefully parse the Commission's findings and conclusions to show where they fail. Instead, the majority simply concludes that because the Commission denied a certificate to Spreader Specialists, it acted arbitrarily and in defiance of the appropriate pro-competitive policy. I am unpersuaded.

The present case is a close one. Had I been sitting on the Commission when the issue came before it, I might have voted for the issuance of the certificate. However, it is not our job to substitute our judgment for that of the Commission when it makes a decision that falls within the bounds of the discretion granted it by the operative statutes. Having reviewed the findings and conclusions of the Commission, I cannot agree that the Commission acted arbitrarily in denying the certificate.

The Commission found that if Spreader Specialists were given the operating authority it sought, the resulting increase in competition likely would have a severe impact on the financial health of existing carriers. Those four carriers, the Commission found, had operating results that ranged from a very slight profit to a large loss. The Commission reasoned that any deterioration in the financial position of those carriers would have a deleterious impact on service to customers. It concluded that under our decision in *Big K*, such a potential deterioration in service would warrant denial of a certificate.

The Commission's findings appear to be supported by record evidence, and its conclusions do not appear to be unreasonable. Therefore, I would affirm.

HALL, C.J., concurs in the dissenting opinion of Justice ZIMMERMAN.